UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

GLENN DAMOND                                        CIVIL ACTION NO. 23-1810

                                                    SECTION P

VS.

                                                    JUDGE TERRY A. DOUGHTY

CITY OF RAYVILLE, ET AL.                            MAG. JUDGE KAYLA D. MCCLUSKY

### REPORT AND RECOMMENDATION

Plaintiff Glenn Damond, who proceeds pro se and in forma pauperis, filed this proceeding on approximately December 27, 2023, under 42 U.S.C. § 1983. He names the following defendants: City of Rayville, Sheriff Gary Gilley, Warden Tyler Wade, Dr. Terri Klick, Nurse Kindra Vaughn, Chief of Security Duchesne, Lieutenant Rodney Rigor, Sergeant Rushing, and Secretary James M. Leblanc.[1,2] For reasons that follow, the Court should dismiss Plaintiff's claims.

### Background

In his 80-page pleading, Plaintiff first states that on June 14, 2022, at Richland Parish Detention Center ("RPDC"), a "known violent trouble making inmate named Sterling Pepe" attacked him without provocation, punching him in his jaw, pushing him into an iron locker, and knocking him to the floor. [doc. # 5, pp. 3, 7]. Plaintiff suffered injuries to his leg and jaw. *Id.* at 7-8. He suffered excruciating pain for ten days. *Id.* at 36. He maintains that Inmate Pepe had

---

[1] This matter has been referred to the undersigned for review, report, and recommendation under 28 U.S.C. § 636, and the standing orders of the Court.

[2] Plaintiff previously filed approximately fourteen lawsuits in federal courts. He is no longer incarcerated; he filed this proceeding after he was released. [doc. # 5, p. 1].

been awake for six days "on crystal meth drugs and smoking mojo (synthetic marijuana)." *Id.* at 8.

Plaintiff claims that Defendants Wade, Rigor, Rushing, and Duchesne failed to "assign violent inmates away from non-violent inmates." *Id.* at 8. He claims that "the jail" maintained a policy of failing to protect and monitor inmates. *Id.* at 12-13. He alleges, "These customs were tolerated by Sheriff Gilley and Wade, adopted and maintained [] because of their negligence." *Id.* at 13, 36. He claims that Wade and Duchesne did not reprimand any officer. *Id.* at 29. He claims that Wade and Duchesne failed to supervise "security" and inmates. *Id.* at 29.

Faulting the City of Rayville, Plaintiff claims that his injuries occurred because "of a longstanding pervasive well-settled widespread practice at the jail which failed to protect inmates, failed to monitor inmates, and failed to assign inmates." *Id.* at 19. Plaintiff recounts several occasions when he witnessed inmates attack other inmates, and he alleges that after being assigned to "cell blocks" the inmates were all returned to the dormitory, exposing him to harm. *Id.* at 13-18.

On June 14, 2022, Nurse Miller gave Plaintiff Ibuprofen and an ice bag "because she believed Plaintiff was suffering from a muscle strain." *Id.* at 20.

On an unspecified date, Plaintiff "filed a medical request, detailing the incident" and his injuries. *Id.* at 21. He requested x-rays and physical therapy. *Id.* On June 16, 2022, Plaintiff spoke with Sergeant Jackson and Nurse Vaughn about his medical request and "informed them about the incident." *Id.* at 22. He claims that Nurse Vaughn ignored his requests and refused him x-rays. *Id.* at 21-22.

Also on June 16, 2022, Plaintiff met with Dr. Terri Klick, who prescribed Naproxen and told him "that she would order [an] x-ray if conditions persist." *Id.* at 23.

Plaintiff claims that Nurse Vaughn "refused to treat" him with Naproxen even though Dr. Klick prescribed it. *Id.* at 23. He alleges that Vaughn intentionally treated him incorrectly with Ibuprofen, causing him to suffer extreme pain for 7-8 days. *Id.* On June 23, 2022, seven days after Dr. Klick prescribed Naproxen, Nurse Miller gave Plaintiff Naproxen. *Id.* at 25. Plaintiff suggests that his pain subsided to an extent around June 24-25, 2022; his "painful condition began to improve, and the inflammation was not as bad." *Id.* at 20, 24, 25. He "did not receive his meds until 7 days after they were ordered and 10 days after the incident. [sic]." *Id.* at 26. Another nurse allegedly told him that Naproxen helped him more than Ibuprofen because "Naproxen is anti-inflammation and Ibuprofen is not." *Id.* at 28.

Plaintiff claims that after he "updated his medical status on a medical request form 5 days after the incident[,]" Nurse Vaughn refused to contact Dr. Klick and wrote, "no x-rays were ordered," on "the returned medical form." *Id.* at 24.

Plaintiff claims that he was denied physical therapy from June 14-24, 2022. *Id.* at 9, 11. He requested therapy on June 19, 2022. *Id.* at 26. He maintains that for "those 10 days," his extreme leg pain impaired his ability to sleep, walk, rise, bend, don clothes, stand, sit on the toilet, clean himself after using the toilet, and shower. *Id.* at 9-11. He claims he was denied physical therapy "pursuant to D.O.C. policies" enacted by Secretary Leblanc. *Id.* at 11. Nurse Vaughn allegedly told him that he had to be dying to receive physical therapy "per Leblanc's policy and procedures." *Id.* at 12. He claims he was denied therapy because of "Leblanc's negligence." *Id.* at 26. The lack of physical therapy caused him to "heal slowly" and to suffer pain and "fears, worries, [and] concerns about his health[.]" *Id.*

Plaintiff suffered from some pain until November 2022. *Id.* at 20, 24.

Plaintiff claims that the City of Rayville is "liable because" it employed Dr. Klick. *Id.* at 28. He suggestively claims that the City of Rayville and Sheriff Gilley endorsed and adopted the health care that he received because they did not properly address the grievances he sent them. *Id.* at 30.

Plaintiff claims that Defendants Wade and Gilley failed to "oversee the healthcare program in their jail." *Id.* at 42. He claims that Dr. Klick failed to supervise Nurse Vaughn. *Id.*

Plaintiff claims that Defendants Wade and Duchesne transferred him to another prison in retaliation for starting "legal activities[.]" *Id.* at 29, 31, 39.

Plaintiff seeks $673,000,000.00 in punitive damages and $5,250,000.00 in compensatory damages. [doc. # 5, pp. 4, 49-58].

## Law and Analysis

### 1. Preliminary Screening

Because Plaintiff is proceeding in forma pauperis, his Complaint is subject to screening under § 1915(e)(2). Section 1915(e)(2)(B) provides for *sua sponte* dismissal of the complaint, or any portion thereof, if the Court finds it is frivolous or malicious, if it fails to state a claim on which relief may be granted, or if it seeks monetary relief against a defendant who is immune from such relief.

A complaint is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). A claim lacks an arguable basis in law when it is "based on an indisputably meritless legal theory." *Id.* at 327. Courts are also afforded the unusual power to pierce the veil of the factual allegations and dismiss those claims whose factual contentions are clearly baseless. *Id.*

A complaint fails to state a claim on which relief may be granted when it fails to plead

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); accord *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  A claim is facially plausible when it contains sufficient factual content for the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570).  Plausibility does not equate to possibility or probability; it lies somewhere in between.  *Id.*  Plausibility simply calls for enough factual allegations to raise a reasonable expectation that discovery will reveal evidence to support the elements of the claim. *Twombly*, 550 U.S. at 556.

Assessing whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal, supra.*  A well-pled complaint may proceed even if it strikes the court that actual proof of the asserted facts is improbable and that recovery is unlikely.  *Twombly, supra*.

In making this determination, the court must assume that all the plaintiff's factual allegations are true.  *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998).  However, the same presumption does not extend to legal conclusions.  *Iqbal, supra*.  A pleading comprised of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" does not satisfy Rule 8.  *Id*.  A complaint fails to state a claim where its factual allegations do not "raise a right to relief above the speculative level."  *Montoya v. FedEx Ground Package Sys., Inc*., 614 F.3d 145, 148 (5th Cir. 2010) (*quoting Twombly*, 550 U.S. at 555).  "[U]nadorned, the-defendant unlawfully-harmed-me accusation[s]" will not suffice.  *Iqbal*, 556 U.S. at 677.

"[P]laintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim."  *City of Clinton, Ark. v. Pilgrim's Pride Corp*, 632 F.3d 148, 152-53 (5th Cir. 2010).  Courts are "not free to speculate that the plaintiff 'might' be able to state a claim

if given yet another opportunity to add more facts to the complaint." *Macias v. Raul A. (Unknown) Badge No. 153*, 23 F.3d 94, 97 (5th Cir. 1994).

A hearing need not be conducted for every pro se complaint. *Wilson v. Barrientos*, 926 F.2d 480, 483 n.4 (5th Cir. 1991).

"To state a section 1983 claim, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (internal quotation marks omitted). Consistent with the standard above, a "[S]ection 1983 complaint must state specific facts, not simply legal and constitutional conclusions." *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir. 1990).

## 2. Failure to Protect

To state a failure-to-protect claim, Plaintiff must allege that a defendant's inaction amounted to deliberate indifference. That is, he must allege that a defendant "knew of and disregarded a substantial risk of serious harm." *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 420 (5th Cir. 2017).

Plaintiff states that on June 14, 2022, a "known violent trouble making inmate named Sterling Pepe" attacked him without provocation, punching him in his jaw, pushing him into an iron locker, and knocking him to the floor. [doc. # 5, pp. 3, 7]. He claims that Defendants Wade, Rigor, Rushing, and Duchesne failed to separate violent and non-violent inmates. *Id.* at 8. He claims that "the jail" maintained a policy of failing to protect and monitor inmates. *Id.* at 12-13. He alleges, "These customs were tolerated by Sheriff Gilley and Wade, adopted and maintained [] because of their negligence." *Id.* at 13, 36. He claims that Wade and Duchesne did not

6

reprimand any officer. *Id.* at 29. He claims that Wade and Duchesne failed to supervise "security." *Id.* at 29.

The gravamen of Plaintiff's claim appears to be that Defendants Gilley, Wade, Rigor, Rushing, and/or Duchesne maintained a custom of removing inmates who attacked other inmates from his dormitory, yet returning the aggressor inmates to the dormitory later. He seems to claim that the defendants should have either permanently removed the aggressor inmates from his dormitory or housed non-aggressor inmates elsewhere. [doc. # 5-1, p. 3].

Plaintiff recounts several occasions when he has witnessed inmates attack other inmates:

○ On December 12, 2021, Inmates Pepe, Stackhouse, and Johnson assaulted Inmate Manuel "before Plaintiff was assaulted." "All inmates were placed into the cell blocks." "Manuel was placed back on the same dorm C with Pepe and Johnson." [doc. #s 5, pp. 16-7; 5-1, pp. 3-4].

○ In 2022, Inmate Bodin battered Inmate Marshall during a basketball game. Bodin also fought with Inmate Johnny. Bodin was "taken off the dorm . . . ." "Months later [] Bodin was placed back on dorm with Marshall and Plaintiff. [sic]." [doc. #s 5, pp. 13-14; 5-1, p. 3].

○ Inmates Palmer, Williams, and Hartford brutally battered an unidentified inmate with a knife. "The [victim] was taken off the dorm after he was almost killed." Palmer, Williams, and Hartford were "placed into the cell blocks[,]" but they were released back to the dormitory on an unspecified date. [doc. # 5, pp. 14-15].

○ Inmates Palmer, Williams, Maxwell, and Robinson battered un unidentified inmate. Palmer, Williams, and Maxwell were "taken off the dorm again and put right back together on the same dorm C." [doc. # 5, p. 15].

○ Inmate De Montaz Martin assaulted an inmate nicknamed, Jezzy. The victim was "taken off the dorm and nothing was done to Martin." [doc. # 5, p. 17].

○ In February 2022, Inmate Marcus Jackson and others assaulted Inmate Floyd D. Hays. Hays was "taken to the hospital." The attacking inmates were "placed in the cell block for a couple days, then let right back on Dorm C." [doc. #s 5, p. 18; 5-1, p. 3]. In Plaintiff's exhibit, however, Inmate Hays avers that *he* assaulted Inmate Jackson "because of his disrespectful acts." [doc. # 5-1, p. 5].

A.    <u>Non-Supervisory Allegations</u>

Plaintiff does not plausibly allege that Wade, Rigor, Duchesne, Rushing, or Gilley knew of yet disregarded a substantial risk of serious harm.  For instance, he does not allege that these defendants  knew that any inmate was substantially likely to attack him.[3]  Thus, he does not plausibly allege a claim against the defendants in their individual capacities.[4]

B.    <u>Supervisory Defendants</u>

Plaintiff does allege that supervisory officials—Warden Wade, Sheriff Gilley, and Chief of Security Duchesne—failed to protect him from harm.  "Supervisory officials may be held liable only if: (i) they affirmatively participate in acts that cause constitutional deprivations; or (ii) implement unconstitutional policies that causally result in plaintiff's injuries."  *Mouille v. City of Live Oak, Tex.,* 977 F.2d 924, 929 (5th Cir. 1992).  "Vicarious liability does not apply to § 1983 claims."  *Pierce v. Texas Dept. of Crim. Justice, Inst. Div.*, 37 F.3d 1146, 1150 (5th Cir.

---

[3] In *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986), where an administrator of an inmate's estate sued supervisory state prison officials for failing to protect the inmate, the court found that the administrator failed to state a claim because the administrator did "not allege that a warning was received, and omit[ted] any explanation of how or in what way the defendants 'knew' or 'intended' the attack."  The court added, "The gravamen of the plaintiff's claim appears simply to be that the defendants breached their duty to protect the decedent."  It reasoned further: "nowhere in this pleading does the plaintiff cite any conduct (or specific omissions) that would causally link the defendants to decedent's death.  To successfully plead a cause of action in § 1983 cases, plaintiffs must enunciate a set of facts that illustrate the defendants' participation in the wrong alleged."

[4] Plaintiff suggests that Warden Wade failed to create and assign Plaintiff to an honor dormitory. [doc. # 5, p. 13].  To the extent Plaintiff claims that he was entitled to protective custody, a prisoner "has no constitutional right to a particular classification."  *Mozee v. Crowley*, 188 F. App'x 241, 242 (5th Cir. 2006).   In *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995), the plaintiff argued that "prison officials wrongly denied his requests to be reclassified for protective custody, safekeeping status, or for a unit transfer, all in disregard of his safety."  The court held that "a prison inmate does not have a protectable liberty or property interest in his custodial classification and an inmate's disagreement with a classification is insufficient to establish a constitutional violation."  *Id.*; *see Zamora v. Stephens*, 732 F. App'x 305, 307 (5th Cir. 2018).

1994).  "'[A] plaintiff must show either [that] the supervisor personally was involved in the constitutional violation or that there is a sufficient causal connection between the supervisor's conduct and the constitutional violation.'"  *Brown v. Taylor*, 911 F.3d 235, 245 (5th Cir. 2018) (*quoting Evett v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 330 F.3d 681, 689 (5th Cir. 2003)).

Plaintiff does not plausibly allege that Wade, Gilley, or Duchesne affirmatively participated in failing to protect him from Pepe.  He implies that defendants must have been aware of general inmate-on-inmate violence at RPDC because of the number of attacks on other inmates.  However, this generalized allegation does not confer plausibility on Plaintiff's claims: if Plaintiff is alleging that a defendant affirmatively participated in an unconstitutional act, he must allege that the defendant was deliberately indifferent to *his* safety.  *See Williams v. Martin*, 570 F. App'x 361, 365 (5th Cir. 2014) (finding that the Williams did not state a claim because he "alleged only that defendants failed to curb abuse of prisoners" and did not allege that "prison officials acted with deliberate indifference to [his] safety."); *Silva v. Moses*, 542 F. App'x 308, 311 (5th Cir. 2013) ("the vague contention by Silva that, although the defendants knew of previous violent incidents, they declined to take unspecified protective measures to prevent future attacks such as the one on him, does not show that any risk to Silva was clear to the officers.").

Further, Plaintiff fails to plausibly allege that any defendant implemented an unconstitutional policy, practice, custom, or procedure that caused his injuries.  He does not allege that any defendant created or maintained an explicit policy of failing to separate known violent inmates from other inmates.  Rather, he attempts to allege that a *de facto* policy existed via a custom or pattern of events at RPDC.

Although an official policy "usually exists in the form of written policy statements, ordinances, or regulations, . . . it may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009) (*quoting Piotrowski*, 237 F.3d at 579). When prior incidents are used to prove a pattern, they "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir.), *on reh'g,* 739 F.2d 993 (5th Cir. 1984). A pattern requires similarity and specificity: "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Estate of Davis ex rel. McCully v. City of North Richland Hills,* 406 F.3d 375, 383 (5th Cir. 2005). A pattern also requires "sufficiently numerous prior incidents," as opposed to "isolated instances." *McConney v. City of Houston,* 863 F.2d 1180, 1184 (5th Cir.1989). A plaintiff's "description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts." *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997).

Here, Plaintiff's description of the custom, practice, or pattern and its relationship to the underlying constitutional violation is ultimately too conclusory to constitute a plausible claim. As above, the main thrust of his claim appears to be that Gilley, Wade, Rigor, Rushing, and/or Duchesne maintained a custom of failing to separate (or remove from Plaintiff's dormitory) known violent inmates from other inmates. But Plaintiff does not specify if all the attacks in the bulleted events above—on which he relies to demonstrate a pattern—occurred before Pepe attacked him. In addition, Plaintiff does not explain how defendants should have classified

inmates.  He does not, for instance, state whether by 'known violent inmates' he means only inmates who have attacked others in his dormitory, inmates who have an institutional history of violence (recent or not), or inmates who have convictions or charges of violence.  He likewise does not specify how defendants should have identified 'non-violent' inmates.  He does not specify: (i) if he wanted defendants to remove violent inmates permanently or temporarily (and if so, for how long) from his dormitory; (ii) where defendants should have moved violent inmates; or (iii) if defendants should have separated violent inmates from all other inmates or only from inmates the violent inmates previously attacked.

Further, the disparate bulleted attacks are not sufficiently similar to each other or to the attack on Plaintiff to constitute an established pattern of failing to protect inmates.[5]  For instance, Inmates Pepe, Stackhouse, and Johnson assaulted Inmate Jerry Manuel, but Plaintiff does not state that any defendant knew before this attack that Pepe, Stackhouse, or Johnson was a 'known violent offender.'  More important, he does not allege that the inmates attacked Manuel *because* any defendant failed to separate the inmates from Manuel or *because* the inmates were returned to the dormitory after previously attacking Manuel or others.  Moreover, the inmates *were* separated and "placed into the cell blocks" after the attack, albeit temporarily.  And while "Manuel was placed back on the same dorm C with Pepe and Johnson[,]" Plaintiff does not allege that this decision to only temporarily separate the three inmates caused Pepe and Johnson to attack Manuel again.

---

[5] *See Davidson v. City of Stafford, Texas*, 848 F.3d 384, 396 (5th Cir. 2017), *as revised* (Mar. 31, 2017) ("A pattern requires similarity, specificity, and sufficiently numerous prior incidents."); *Culbertson v. Lykos*, 790 F.3d 608, 628 (5th Cir. 2015) (holding that the plaintiffs failed to allege a "widespread practice" of retaliation because they "offered no evidence that similar retaliation had victimized others.").

Next, Inmate Bodin battered Inmate Marshall during a basketball game.  Plaintiff, however, suggests that defendants failed to separate inmates in his dormitory rather than on a basketball court.  More important, he does not state that any defendant knew before this attack that Bodin was a 'known violent offender.'  And he does not allege that Bodin attacked Marshall *because* any defendant failed to separate the inmates.  In fact, the inmates *were* separated temporarily.  While Bodin was later returned to Marshall's dormitory, Plaintiff does not allege that reintroducing Bodin to the dormitory caused Bodin to attack Marshall (or any other inmate) again.

Inmate Marcus Jackson and others attacked Inmate Floyd D. Hays.  In Plaintiff's exhibit, however, Inmate Hays avers that *he* assaulted Inmate Jackson "because of [Jackson's] disrespectful acts."  [doc. # 5-1, p. 5].  These discrepant versions of the attack do not aid Plaintiff in establishing a pattern of failing to separate inmates from violent inmates because Plaintiff does not plausibly allege which inmate was 'known' to be violent before the attack.  And like above, the inmates *were* temporarily removed from the dormitory "after a few days."  *Id.*  The majority, if not all, of the other bulleted events/attacks suffer from the same or related discrepancies and disparities explained above.

At best, Plaintiff presents one instance where inmates attacked again after they returned to the dormitory.  Inmates Palmer, Williams, and Hartford battered an unidentified inmate with a knife.  Palmer, Williams, and Hartford were "placed into the cell blocks[,]" but they returned to the dormitory on an unspecified date.  Palmer, Williams, Maxwell, and Robinson battered un unidentified inmate once more.[6]  Palmer, Williams, and Maxwell were "taken off the dorm again and put right back together on the same dorm C."

---

[6] Plaintiff does not specify which attack occurred first.

To reiterate, Plaintiff appears to claim that the attacking inmates were all returned to his dormitory following the attacks (i.e., they were not permanently separated from all other inmates in the dormitory) and that, consequently, one of them (Pepe) attacked him.  The critical problem is that (with one exception) Plaintiff does not allege that the attacks on which he relies to allege a pattern were caused by any defendant returning a 'known' violent inmate to the dormitory.[7]  In short, he does not identify sufficiently numerous, similar, and specific prior events or omissions to constitute a pattern, especially given his failure to provide context like the number of prisoners at the facility or in the dormitory and the number of attacks over a specified length of time.[8]  One similar event/omission at RPDC over approximately two years does not reflect a practice that was 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'

---

[7] In *Jason v. Tanner*, 938 F.3d 191, 197 (5th Cir. 2019), where "having only two guards making rounds and relying on other guards peering out of window" caused the risk to the plaintiff, the court reasoned that the "situation might have been a mere reality of the prison's budget." The court added: "[T]here was no repeated pattern of violations.  True, there had been three yard fights with brooms and one with a mop.  Now there's been one with a yard tool. But prison fights are lamentably common.  And three yard fights with brooms and one with a mop just aren't enough to constitute a pattern." *Id*.  "[E]ven a repeated pattern of violence isn't by itself enough to prove deliberate indifference." *Id*. at 198.

[8] *See Peterson v. City of Fort Worth, Tex*., 588 F.3d 838, 850-51 (5th Cir. 2009) (twenty-seven complaints of excessive force against city police officers over a four-year period did not suggest a pattern so common and well-settled as to constitute a custom that fairly represented an official policy that was permissive of excessive force, especially given the omission of information concerning the size of the police department or how many arrests that department made during the relevant time period); *Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002) (finding that eleven incidents of warrantless entry did not support a pattern of unconstitutional warrantless entry because "[e]leven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces.").

Even assuming Plaintiff did identify a pattern of returning violent inmates to the dormitory and failing to protect inmates from resultant attacks by those violent inmates, he does not plausibly plead that the custom was the moving force behind any constitutional violation.  To demonstrate that the policy was the "moving force" behind a constitutional violation, a plaintiff must "demonstrate a direct causal link between the [] action and the deprivation of federal rights."  *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).  "[T]he connection must be more than a mere 'but for' coupling between cause and effect."  *Valle v. City of Houston*, 613 F.3d 536, 546 (5th Cir. 2010) (*quoting Thompson v. Connick,* 578 F.3d 293, 300 (5th Cir. 2009)).  "The causation prong requires proximate causation."  *York v. Welch*, 2024 WL 775179, at *3 (5th Cir. Feb. 26, 2024).

Plaintiff suggests that after Pepe and others attacked Manuel on December 12, 2021, Pepe returned to Plaintiff's dormitory.  Plaintiff does not specify when Pepe returned, but he suggests it was shortly after the attack on Manuel.  Pepe, however, attacked Plaintiff on June 14, 2022.  It is not plausible that returning Pepe to the dormitory, which housed multiple inmates, was the direct and proximate cause of Pepe's attack on Plaintiff over six months later.  The nexus (if any) between the alleged custom and Pepe's attack is simply too attenuated.[9]  In fact, Plaintiff

---

[9] In *Williams v. Banks*, 956 F.3d 808, 812 (5th Cir. 2020), the court reasoned that an inmate's prior history of violence with another inmate did not mean that defendants knew the dangerous inmate posed a substantial risk of serious harm to the plaintiff.  For support, the court cited the following: "*Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011) ("An inmate's history of violence alone is insufficient to impute to prison officials' subjective knowledge of the inmate's danger to harm other inmates." (*citing Norman v. Schuetzle*, 585 F.3d 1097, 1104-06 (8th Cir. 2009), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, (2009)); *see also Sanders v. Goodween*, 2013 WL 5818610, at *6 (M.D. La. Oct. 29, 2013) ('[T]he mere fact that the offending co-inmate may have been involved in one or more prior inmate-on-inmate confrontations does not compel a finding that the determination to house the two inmates in a two-person cell at DWCC amounted to deliberate indifference.')."  *See Williams v. Martin*, 570 F. App'x 361, 365 (5th Cir. 2014) ("Williams alleged only that defendants failed to curb abuse of

suggests that Pepe attacked him because Pepe had been awake for six days "on crystal meth drugs and smoking mojo (synthetic marijuana)."  [doc. # 5, p. 8].

The Court should dismiss these claims.

C.    Conclusory Allegations

Plaintiff claims that "the jail" maintained a policy of failing to protect and monitor inmates, that Wade and Duchesne did not reprimand any officer, that Wade and Duchesne failed to supervise "security," that the City of Rayville maintained a practice of failing to protect, monitor, and assign inmates, and that "customs were tolerated by Sheriff Gilley and Wade, adopted and maintained [] because of their negligence."

These allegations are no more than conclusory and formulaic recitations of causes of action which are insufficient to raise plausible claims.  Plaintiff essentially and vaguely claims that defendants failed to protect him, simply rephrasing the moniker, 'failure to protect,' to 'failure to monitor, reprimand, or assign.'[10]  As above, a pleading comprised of  "labels and

---

prisoners and that they knew that Martin had a propensity to assault prisoners based on his disciplinary records; his bald and conclusory allegations are insufficient to state a claim.").

[10] *See Salas v. City of Galena Park*, 2022 WL 1487024, at *5 (5th Cir. May 11, 2022) ("The petition only contains legal conclusions of municipal liability.  For instance, that 'Galena Park was indifferent to Hector Salas' serious medical needs, mental health needs and protection.'  Or 'Defendant Galena Park failed to train and to failed to adequately supervise its jail detention officers and employees and agents.'  These statements are grounds for liability that one might conclude exist from a certain set of factual allegations, but they are not factual allegations themselves."); *Robles v. Ciarletta*, 797 F. App'x 821, 834 (5th Cir. 2019) ("The Robles' claim that Aransas County has a custom or practice of 'not having the proper policies in place to prevent the Constitutional violations suffered by plaintiffs.' The Robles offer no basis for that claim other than the conclusory allegation itself."); *Martinez v. City of N. Richland Hills*, 846 F. App'x 238 (5th Cir. 2021) (arrestee failed to state a claim when he alleged that a city failed to train detention officers on how to provide medical care; arrestee's complaint did not contain any specific city policy and did not allege that any unidentified custom or policy was the moving force behind the officers' alleged misconduct).

conclusions" or "a formulaic recitation of the elements of a cause of action" does not satisfy Rule 8.

The Court should dismiss these claims.

**3. Medical Care**

To plead a constitutional violation, a plaintiff "must demonstrate that a government official was deliberately indifferent to 'a substantial risk of serious medical harm.'" *Bailey v. E. Baton Rouge Par. Prison*, 663 F. App'x 328, 330 (5th Cir. 2016) (*quoting Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000)). A prison official acts with deliberate indifference to an inmate's health "only if he knows that [the] inmate[ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *see Reeves v. Collins*, 27 F.3d 174, 176-77 (5th Cir. 1994) (applying *Farmer* to a denial of medical care claim). A plaintiff must establish that a prison official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

"[N]either an incorrect diagnosis nor the failure to alleviate a significant risk that should have been perceived, but was not, is sufficient to establish deliberate indifference." *Blank v. Bell*, 634 F. App'x 445, 448 (5th Cir. 2016). "Unsuccessful treatment, medical malpractice, and acts of negligence do not constitute deliberate indifference; nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances. Moreover, a delay in treatment is not unconstitutional, unless there has been deliberate indifference that results in substantial harm. In short, [d]eliberate indifference is an extremely high standard to meet." *Id.* (internal quotation marks and quoted sources omitted); *see Alton v. Tex. A & M Univ.*, 168 F.3d 196, 201 (5th Cir.

1999) ("Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference."); *Frazier v. Keith*, 707 F. App'x 823, 824 (5th Cir. 2018) ("The choice between forms of treatment is a classic example of a matter of professional judgment and does not support a finding of deliberate indifference.").

A.    X-Rays and Physical Therapy

Plaintiff claims that Nurse Vaughn failed to provide (i) physical therapy for ten days and (ii) x-rays. Plaintiff, however, simply disagrees with the treatment he did receive. On June 14, 2022, Nurse Miller gave Plaintiff Ibuprofen and an ice bag. [doc. # 5, p. 20]. Plaintiff also attaches an exhibit indicating he received a muscle rub, and Nurse Vaughn continued his Ibuprofen regimen. [doc. # 5-1, p. 8]. The decision to forego x-rays and physical therapy for ten days does not reflect deliberate indifference. *See Petzold v. Rostollan*, 946 F.3d 242, 250 (5th Cir. 2019) ("[B]ecause medical treatment was provided, even if it was . . . based on a perfunctory and inadequate evaluation, it was not denied."); *Adams v. Fuller*, 2022 WL 17250191, at *1 (5th Cir. Nov. 28, 2022) ("[T]he medical records are replete with notes of sick calls, examinations, and diagnoses related to his ear, which further rebut his allegations of deliberate indifference."); *Gibson v. Collier*, 920 F.3d 212, 220 (5th Cir. 2019) ("There is no . . . claim just because an inmate believes that medical personnel should have attempted different diagnostic measures or alternative methods of treatment.").

Further, even assuming Plaintiff alleges his symptoms continued after he received medical care, he does not allege that he informed Vaughn that his injuries "dramatically increased in severity" after he received treatment, such that Vaughn "would have effectively denied or delayed treatment for a new injury not previously treated . . . ." *See Petzold v. Rostollan*, 946 F.3d 242, n. 42 (5th Cir. 2019). Rather, Plaintiff suggests that at worst Vaughn

17

deferred to the prior treatment/medication Plaintiff received. This does not reflect deliberate indifference: "[A]n official defers to prior treatment—and doesn't delay it—when he knows an injured prisoner has recently received medical care and denies the prisoner's additional treatment request for the same injury. . . . [M]erely refusing to provide additional treatment is insufficient for deliberate indifference." *Petzold*, 946 F.3d at 242 (finding that a supervisor did not deny or delay treatment because a nurse already treated the plaintiff's injury and the supervisor, who was aware of the prior treatment, simply "*deferred* to a medical professional's prior treatment."). As the court stated in *Petzold*, a plaintiff "cannot disguise [] deliberate inaction as [] deliberate indifference." *Id.*

If Plaintiff claims he did not receive an additional diagnostic measure (an x-ray), he also fails to state a plausible claim. *See Estelle v. Gamble*, 429 U.S. 97, 107 (1976) ("[W]hether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment."); *Mathis v. Alexander*, 49 F.3d 728 (5th Cir. 1995) (finding complaints of not receiving an x-ray or follow-up examination did "not rise to the level of deliberate indifference" because "[a] mere disagreement with one's medical treatment is not sufficient to state a cause of action . . . .").

Plaintiff next claims he was denied physical therapy "pursuant to D.O.C. policies" enacted by Secretary Leblanc. *Id.* at 11. He claims that Nurse Vaughn told him that he had to be dying to receive physical therapy "per Leblanc's policy and procedures." *Id.* at 12. He adds that he was denied therapy because of "Leblanc's negligence." *Id.* at 26.

However, because Plaintiff does not adequately plead that he was unconstitutionally denied physical therapy, he lacks a viable supervisory liability claim against Leblanc. *Sanchez v. Griffis*, 2023 WL 7984732, at *2 (5th Cir. Nov. 17, 2023) (holding that because the plaintiff's

underlying claim for excessive force failed, any claims for supervisory liability and municipal liability also fail).  Otherwise stated, Leblanc's alleged unlawful policies did not cause a violation of Plaintiff's constitutional rights.  *See Barber v. Quarterman*, 437 F. App'x 302, 304-05 (5th Cir. 2011) ("According to Barber, the director of the Texas Department of Criminal Justice and the warden of the prison should be held liable for failing to properly train the other officials on the procedures to follow when a prisoner reports that his safety is in danger and for implementing unconstitutional policies that were inadequate to protect prisoners. However, because the policies have resulted in no violation of Barber's rights, he cannot succeed."); *Sanchez v. Grounds*, 591 F. App'x 263, 265 (5th Cir. 2015) (finding, where the plaintiff alleged that a warden "created an unwritten custom and policy to punish inmates, through demotion in classification, without notice and a hearing[,]" that the plaintiff's claim was unavailing "because the purported policy does not result in any constitutional injury.").

    The Court should dismiss these claims.

B.    <u>Failure to Provide Naproxen</u>

    Plaintiff received an anti-inflammatory pain relief medication, Ibuprofen, but he claims that Nurse Vaughn did provide a different anti-inflammatory pain relief medication, Naproxen, which Dr. Terri Klick prescribed on June 16, 2022.  Seven day later, on June 23, 2022, Nurse Miller gave Plaintiff Naproxen.

    Again, Plaintiff merely quarrels with the care he did receive.  In *Mathis v. Alexander*, 49 F.3d 728 (5th Cir. 1995), for example, "Mathis complained that no X-rays were taken, that he received no follow-up examination, . . . and that he received only Tylenol for pain, which he reports was ineffective."  The court opined: "These allegations likewise do not rise to the level of deliberate indifference to a prisoner's serious medical needs or to an excessive risk to inmate

health.  A mere disagreement with one's medical treatment is not sufficient to state a cause of action under § 1983."

Vaughn did allegedly fail to provide the prescribed Naproxen, providing Ibuprofen instead.  [doc. # 5, p. 23].  Vaughn's decision, however, is not the type of egregious intentional conduct amounting to deliberate indifference.  At best, Vaughn's alleged failure to provide the prescribed medication amounts to potential negligence or malpractice.  *See Shockley v. Fox*, 444 Fed. Appx. 36, 37-38 (5th Cir.2011) (upholding the dismissal of a claim that prison officials were deliberately indifferent where they did not fill a narcotic prescription because of prison policy but instead offered the inmate other medications); *Lee v. Hennigan*, 98 F. App'x 286, 288 (5th Cir. 2004) ("The fact that the defendants gave Lee Tylenol contravenes his allegations of indifference."); *Sanford v. Tarrant Cty. Sheriff's Dep't*, 628 F. App'x 301, 302 (5th Cir. 2016) ("Sanford's complaint that he received only ibuprofen for pain amounts to a mere disagreement with medical treatment, which does not constitute a constitutional violation.").  Treating Plaintiff with one pain-relieving medication instead of another pain-relieving medication does not amount to intentionally treating Plaintiff incorrectly.

The Court should dismiss this claim.

C.    City of Rayville, Sheriff Gilley, Dr. Klick, and Warden Wade

Plaintiff claims that the City of Rayville is "liable because" it employed Dr. Klick, that Defendants Wade and Gilley failed to "oversee the healthcare program in their jail," that the City of Rayville and Sheriff Gilley endorsed and adopted the medical care that he received, and that Dr. Klick failed to supervise Nurse Vaughn.

The formulaic nature of Plaintiff's allegations aside, these claims fail because Plaintiff does not sufficiently plead a predicate constitutional violation: he does not plausibly allege that

any defendant denied him constitutionally adequate medical care.  Thus, he does not plead supervisory or municipal liability.  *See Sanchez*, 2023 WL 7984732, at *2 (because the plaintiff's underlying claim for excessive force failed, any claims for supervisory liability and municipal liability also failed); *Cook v. Hopkins*, 795 F. App'x 906, 918 (5th Cir. 2019), *cert. denied,* 140 S. Ct. 2643 (2020) ("[B]ecause we have found no constitutional violations on the part of the Individual Defendants, the City cannot be subjected to municipal liability."); *Jackson v. City of Hearne, Texas*, 959 F.3d 194, 204 (5th Cir. 2020) ("[H]e fails to allege a constitutional violation against any defendant. That alone forecloses his claim [against the city].").

The Court should dismiss these claims.

**4. Retaliation**

Plaintiff claims that Defendants Wade and Duchesne transferred him to another prison in retaliation for "legal activities[.]"  [doc. # 5, pp. 29, 31, 39].

To prevail on a retaliation claim, a plaintiff must prove: (1) the exercise of a specific constitutional right; (2) the defendants' intent to retaliate for the exercise of that right; (3) a retaliatory adverse act; and (4) causation, which in this context means that, but for the retaliatory motive, the complained of incident would not have occurred.  *McDonald v. Steward*, 132 F.3d 225, 2331 (5th Cir. 1998).  Courts must "carefully scrutinize" retaliation claims to "assure that prisoners do not inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around them."  *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995).[11]

---

[11] "The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties.  Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions."  *Id.* (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)).

A plaintiff must produce direct evidence of motivation or allege a chronology of events from which retaliation may be plausibly inferred. *Woods*, 60 F.3d at 1161. "Mere conclusory allegations of retaliation are insufficient[,] . . . a plaintiff must allege more than his personal belief that he has been the victim of retaliation." *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999). With respect to the third prong above, "Retaliation against a prisoner is actionable only if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights." *Smith v. Hebert*, 533 F. App'x 479, 482 (5th Cir. 2013).

Here, Plaintiff does not plausibly allege a retaliatory adverse act. "[A] claim that an inmate was transferred to a more dangerous prison in retaliation for an exercise of a constitutional right will support a Section 1983 claim." *Ward v. Fisher*, 616 F. App'x 680, 684 (5th Cir. 2015). But Plaintiff does not allege that the facility to which he was transferred was more dangerous than, or otherwise inferior to, RPDC. To the contrary, Plaintiff makes every effort to establish that RPDC was an exceedingly dangerous facility, claiming that officials there failed to protect him from violence. He requested transfer away from RPDC "multiple times." [doc. # 5, p. 31].

Plaintiff does state that multiple inmates "almost" brutally injured him and stole from him at the new facility. But an inmate *did* injure him at RPDC, so in this respect RPDC was the more dangerous facility; at best, the two facilities were equivalent. *See Baldwin v. Rodgers*, 600 F. App'x 301 (5th Cir. 2015) ("Further, he does not allege or show that the facility to which he was transferred was inferior or more dangerous than the Mississippi State Penitentiary in which he was previously incarcerated."); *Escobarrivera v. Whitaker*, 2022 WL 17352178, at *2 (5th Cir. Dec. 1, 2022) ("Escobarrivera failed to plead that the unit to which he was transferred was more dangerous or restrictive than his prior unit.").

The Court should dismiss this claim.

**5. State Law Claims**

Plaintiff claims that Defendants Rigor, Vaughn, Wade, Rushing, and Duchesne committed tortious acts and that Sheriff Gilley is vicariously liable as their employer under La. Civ. Code art. 2320.  [doc. # 5, p. 43].  He claims that Defendant Leblanc violated "La. C.C. art 2315."  *Id.* at 45.  He also intersperses other state law citations throughout his 80-page pleading.

Plaintiff's state law claims are not cognizable under Section 1983.  For instance, in *Mathews v. Bowie Cty., Tex*., 600 F. App'x 933, 934 (5th Cir. 2015) (internal citations removed), where the plaintiff alleged that correctional officers violated a state statute, the court opined: "his conclusory allegations that his treatment violated the Texas Administrative Code are insufficient to establish § 1983 liability.  Such action may constitute a breach of contract or violation of state law, but unless the conduct trespasses on federal constitutional safeguards, there is no constitutional deprivation."  "[A] violation of a state statute alone is not cognizable under § 1983 because § 1983 is only a remedy for violations of federal statutory and constitutional rights." *Woodard v. Andrus*, 419 F.3d 348, 353 (5th Cir. 2005); *Moore v. City of Dallas, Texas*, 2024 WL 913368, at *3 (5th Cir. Mar. 4, 2024) ("The district court dismissed Moore's claims against Webb for abuse of process and IIED, correctly concluding that those are common law torts, not constitutional violations redressable via § 1983.").

Further, the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims.  When, as recommended here, all claims which conferred federal subject matter jurisdiction are dismissed, the Court may decline to exercise supplemental jurisdiction over the remaining state law claims.  28 U.S.C. § 1367(c)(3).  In fact, this is the general practice. *See Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009) ("The

23

general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial."). District courts have "wide discretion to dismiss state law claims" under Section 1367. *Adams v. Fuller*, 2022 WL 17250191, at *1 (5th Cir. Nov. 28, 2022).

Under the interests of economy, convenience, fairness, and comity, the Court should dismiss any remaining state law claims without prejudice.[12, 13]

## <u>Recommendation</u>

For the reasons above, **IT IS RECOMMENDED** that Plaintiff Glenn Damond's claims arising under the laws and Constitution of the United States be **DISMISSED WITH PREJUDICE** as frivolous and for failing to state claims on which relief may be granted.

**IT IS FURTHER RECOMMENDED** that Plaintiff's claims arising under state law be **DISMISSED WITHOUT PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed. R.**

---

[12] *See Spell v. Edwards*, 2023 WL 2110889, at *1 (5th Cir. Feb. 17, 2023); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

[13] The limitations period is tolled for a minimum of 30 days after dismissal. 28 U.S.C. § 1367(d).

**Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.** *See Douglass v. United Services Automobile Association*, **79 F.3d 1415 (5th Cir. 1996).**

In Chambers, Monroe, Louisiana, this 22nd day of March, 2024.

_____
Kayla Dye McClusky
United States Magistrate Judge